Good morning, Your Honors. I do please the court, Leland Stark, on behalf of the plaintiff, Appellant. I'd like to reserve half the time for rebuttal. Manage your own time. I'll try to remind you. Your Honor, this is a case involving a bus driver who admitted in deposition that he narrowly missed the curb, mistook the accelerator for the brake, and admitted at 25 miles per hour, he hit the plaintiff's vehicle with such force that it spun around in front of him, as it escalated, and he hit it again. At trial, he cuts his speed in half. The client suffered injuries to her neck, concussive injuries, which weren't immediately diagnosed, which is the problem in the case. Counsel, I hate to interrupt you, but we don't have a lot of time in these arguments, so forgive me if I just dive right in. Please, Your Honor. You know, I have a lot of empathy for your client. I really do. But you've got three different types of evidence that you, I don't know whether you were the lawyer at trial or not, but the lawyer was obligated on behalf of his client to produce certain information to the other side based upon the local rules and the larger Federal Rules of Civil Procedure. It didn't happen. And the question is, are these rules to be given any effect? We weigh that against the harm to your client. Your client was allowed to testify about each of these things. You lost the ability to have some experts, some other people, but that wasn't the fault of the other side. That was the fault of the plaintiff's counsel, was it not? If you'll please, Your Court, the other side, if you will, signed a report in April of 2011 in which both sides agreed, the plaintiffs said, that we're going to have specifically a neuropsych, an accident reconstructionist, a biomechanical expert, an orthopedist, Dr. Wu by name, and an economist and voc rehab. The other side signed that they anticipate designating responsive experts and doing one medical exam. Okay. That's all great. But the reality is, in a normal situation, you know that the other side is going to want to take the deposition of any expert or any witness to see what they're going to say. And the evidence was simply the names were not provided in accordance with the rules so that they would have time to do that. Were we to permit plaintiffs to do what's done here on a normal basis, it would wreak havoc with any kind of discovery in this situation, would it not? It didn't happen that way, Your Honor. Okay. Tell me how it happened. What happened in this case is they had the information in general. Well, in general, but they didn't have their names, they didn't have their addresses. They didn't have their names. In this case, they had all the medical records. They had 65 pages of answers to interrogatories, which literally listed and discussed every single doctor, every single ailment, every single witness. They had a full response to the demand for inspection, which included 19 separate file folders that included the Bank of America's statements for six years. Well, let's say all that's true, Counsel. That makes all the more inexplicable why this information was not produced in accordance with the rules. If you had it all ready to go, why wasn't it produced? Because you could have all these names in your interrogatories, but if you don't list an expert, for example, they don't know whether you're going to call the expert or not, do they? Here's what we had. We signed following their receipt of all their information. They had yet to take the client's deposition. Recognizing the problems, they entered into a stipulation to extend the discovery for another 63 days. Could you give me the time frame for that? Was that November? Yes. Okay, thank you. November 26th, I think. Is that the stipulation we're talking about? Or was that the date of your discovery in November? November 29th was the date of discovery. And then December 29th or 30th was the date of the stipulation. That second stipulation was for 63 days. So the first two months of 2012? That's right. Okay. And the sum total of all the time following that full disclosure was three months, over three months. When you say full disclosure, are you talking about the interrogatory answers in May? Interrogatory answers. But you still didn't identify what experts you were going to call at trial. You identified potential medical witnesses. That was about it. You passed your time for disclosure, and you get down to the stipulation to depose experts, and as I read the record, tell me if I'm wrong, you still hadn't disclosed an expert by the time that stipulation was entered. Is that true? That is true. Okay. There were two reasons. One, the client had just started to SC, and there was a whole group of new doctors, a team, that were then looking at her because up until that time she didn't have diagnoses. These cases, frankly, boil down to just a few items. This is an auto versus a bus case. It comes down to a few scans, a few charts, opposing orthopedists, opposing neuropsychs, and opposing PET scan experts, and that's the four corners of a case like this. But, counsel, you seem to be saying two things. If her state of medical recovery was still in flux, I've looked and didn't see any requests for continuing to the trial date or extension of discovery, if that was what was happening in early 2012, but I want to give you a chance to tell me if I've overlooked a request to continue the trial date. We thought that that would be at the time we signed that additional 63 days, which was the end of December through, and then it was continued after that. You thought that would be adequate? Yes. All right. The other question that bothers me about this case is that your client, according to the trial court judge, had an extensive medical history. So when you say that the four corners were as limited as you just described, it seemed to me that a significant question in this trial from the get-go was going to be causation and whether this accident caused her damages. So you mentioned early on in April your intent to call an accident reconstructionist and a biomechanical expert, presumably to establish causation. Were those folks ever named, experts of those types ever named? Yes, they were. They were all named at the same time. Who was the biomechanical expert, please? He was a gentleman from a service in Orange County that had testified for the firm a number of times over the years. Was a report pursuant to Rule 26 ever provided for him? It was not. Okay. What happened was the defense, two things happened. First, with respect to each of their experts, in that particular case Plaintiff's Counsel made absolute sure that they were totally supplied with everything they needed. Needed for what? For their depositions. And as a result, their neuropsych, their PET scan expert, and their orthopedist had absolutely everything that was available. Now you're talking about the defense experts. Yes. Okay. And the objective here was to, if possible, resolve the case. But that seems to hinge upon the notion that the defense isn't prejudiced by not knowing what your case is at trial. It's one thing to say we've given the discovery over so the defendant's experts can get ready. But what the trial court was concerned about is that the defense wasn't able to prepare to respond to your case. The reason that they were is that because of the nature of this, it's all experts. The plaintiff herself can't testify. I thought she did testify. She did, but she can't testify on the ultimate issue, which is causation and damages. And in this case, the lens through which the defense sees the case and evaluates it is through their own experts in any event. Counsel, were you the trial counsel? I was. Okay. So why didn't you produce this information? I gather that you were strategizing initially thinking maybe this would force a settlement. But at some point, I assume you know the local rules. You remember the bar. You know that. You know what the federal rules say. What were you thinking? I mean, this is bizarre to me. I don't understand why this was not produced. Highly prejudicial to your client, and you're telling us they had certain information. But by any measure, the government was not given the information it needed to be able to find out before the trial what you were going to present. And, for example, the prior medical history that my colleague referred to, that's incredibly important in something like this. If your client has all kinds of aches and pains and serious medical issues before the accident, that's important for the defense to know, is it not? You're right. They did. The reason that they did is that as summer came into fall in 2011, I realized that there should be a single set of records. The problem that was going on at the time was the client was finally receiving diagnosis, as to what was going on. And were we to send out authorizations and attorney's letters to the various doctors, it would, who knows what would happen to it. What do you mean? They would have gotten the medical information, and you supply it even though it's piecemeal, but at least they know what's going on. So I phoned up defense counsel and suggested to her that if she would forward to us the medical charts, lock, stock, and barrel, we would limit our entire case to the four corners of those medical charts. And that way she would get all the medical charts from the beginning, well in advance of the time for their experts' depositions. All the experts could rely on that as being the sole four corners of the case. And their evaluations, given in their depositions, would become a solid basis upon which the full case could be evaluated by the defense. Were you intending to call all of these doctors live at trial? No, we didn't. In fact, we cut them all back to, I think, four. Right, but I mean, so you were going to call four doctors live at trial? You weren't going to do a perpetuation deposition? Call the defense doctors alive at trial? No, your treating physicians. Oh, we were going to call three. The neuropsych. Dr. Moore. Yes. Okay. The surgeon. Melamed, is that right? Melamed. Okay. And... So you had three, and you were, you had arranged and you were going to propose to present those as live testimony as opposed to through a perpetuation deposition? It's pretty tough to get doctors to appear live, I can tell you, as you know. So the common practice is to do a perpetuation deposition, then you have the cross-examination, you have it in the MAG, and you've done it in the disclosure. So why didn't you do that? In lieu of that, what we did was I made sure that each of the experts the defendants had had all of the records of our respective experts, and that way they'd be entirely prepared for anything our men and women would say. Right, but they still have the right to depose your experts. Yes, they do. And what happened was, notwithstanding the efforts to extend the time from the last day of December into March, they sat on their hands. They decided we're not going to take any plaintiff's experts, and we're going to see if we can get this thing dismissed. Isn't their response to that going to be that they weren't going to take the experts' depositions because they didn't have the experts' reports? Well, first they had the experts' reports, and let me explain. With respect to our neuropsych, she did a confidential neuropsych report that was not she didn't want to release on a subpoena. The defense's neuropsych wanted that report before the defense neuropsych saw our client. I sat on our neuropsych, figuratively, and got her to fax that report to their neuropsych so that she was in a position, not only to be prepared, but to know exactly the questions that were asked by her opponent, and she could design, which she did, a test that would perhaps enhance her position vastly greater than if she just gave a regular test. Does that report speak to causation? That report... As opposed to taking a snapshot and assessing your client's condition. The causation was in a different report, which was picked up in the subpoena in general. What was not included in the subpoena to the defense and then later to us was the confidential report. But my interest was getting total disclosure on that, because if it didn't exist, it wouldn't settle. Why didn't you disclose the 2011 report until 2012? You didn't report. On the list of doctors? Yeah. The client found that at SC they were coming up with different diagnoses than we'd ever heard before. We saw that there could be one or two experts there that would be game changers, and we wanted to include them, but I had to get their permission to include them, and when we finally did, we were able to give the list. Okay. I'm afraid you're over your time, so our questions are taking over your time, We'll hear from the government. May it please the Court, Assistant United States Attorney Alarise Medrano for the government. Were you also trial counsel? Yes, I was. There are a number of issues raised in the opening this morning, and I can address those briefly. Unless the Court has direct questions, I think most of this has been covered previously in the pleadings and also in the transcripts that are attached as part of the supplemental excerpts of record. Counsel, I have a couple questions. Yes. I think there was a representation made to the trial court that your client didn't have, the government did not have all the documents that were marked as exhibits, or designated as exhibits by plaintiff, but you had the medical records, right? That's correct. We had some medical records, which we had subpoenaed on our own at the beginning of the case, based on the limited information that we had, and that was basically a one-page summary attached to the complaint. As time went on, we were able to subpoena additional records. So you had some of the exhibits, is that right? We had very limited of the 1 through 77 exhibits that were identified by the plaintiff in the joint exhibit report. I'm not sure this matters very much, but just logistically it would help me. In many personal injury cases, what happens is the plaintiff signs a release at defendant's request, and defendant goes out and gets the records on its own. If that happened here, I would think you at least knew the names of the treating physicians. You know who to ask for the records. So that's my first question, is that what happened. And my second question is whether there was an agreement that those would then be provided to plaintiff's counsel so that one universal set of documents would be available. There was a request for information about her doctors based on the limited one page that we had. So she signed a release? She signed a release eventually. It was difficult to get that from her, and part of the frustration then led to what plaintiff has characterized as an agreement, which was never a formal agreement. Okay, so just get that. You couldn't have gotten her records without her signing the release, so she did, right? She did, and it took some time to get that. Okay. How did you know where to send the release? I had a paralegal in my office research how to find these doctors, and again, that's part of the reason why it took so long. So she didn't give you contact information, but she gave you the identification, I think with a complaint at least, of some of her treaters, is that right? Yes. She had Dr. Ishihara of Torrance. She had Oak Tree Imaging, Katz Physical Therapy, Dr. O'Connell from Newport Beach, Dr. Privatera of Covina, and an orthopedic clinic in Los Angeles, right? That was correct. That's what you knew at the beginning. That's right. And of those doctors, we later see a new list in February, much after the disclosure. Forgive me. I know I keep interrupting. I'm sorry. That's okay. When you say we saw a new list in February, you're speaking of February of 2012? 2012. And at that point, the trial was set for April of 2012? Correct. Okay. Please continue. The only common doctor on that list was Dr. Jung. There were two, Dr. Jung and Dr. O'Carroll. Right. Then a month later in March, just a month before trial, we get yet another list that has three doctors that had never previously been disclosed, and others that plaintiff represented to this court that he had produced quote-unquote expert reports for, and I would invite the court to look at those reports, which begin at Supplemental Excerpt of Record 136. So we're talking about Dr. Malamba, Dr. Moore, Dr. Wu. Are those the new ones? Or are there some additional? So there's some additional that were never disclosed, and those show up for the first time in March. Those are McCormick, Williams, and Ishihara. But not Dr. Wu. He had been disclosed from the outset. Dr. Wu had been disclosed in the late expert designation on February 6, 2012. And Ishihara was from the beginning. That's on the complaint, so you knew that. I'm sorry. Ishihara, again, confusing names. Itomura was the one that came up later on. Yeah. Itomura. Ishihara was an interesting case because this is a doctor who was listed at the outset as an attachment to the complaint, and we sought records from this doctor and received a certification that there were no records for this doctor. And that led the district court to make a finding at the hearing on the motions in limine that he found the information attached to the deposition to be not credible. We couldn't rely on there actually being the records for the individuals listed. My notes show that Dr. Wu was disclosed. Dr. Wu, the brain imaging senator at USC, was disclosed on April 8, 2011 at the time of the party's joint scheduling conference report. So that wasn't a new name. It was not a new name. We received a single-page document, and there was significant discussion between plaintiff's counsel and myself about the fact that this was not sufficient and that we needed to have a report if he intended to use this doctor as an expert. I think I just misunderstood you. I thought you were telling me that you didn't hear about Dr. Wu until February. You must have meant February 2011. I'm sorry. He's not listed as an expert witness until we get that late disclosure on February 6, 2012. Okay. So you knew of his existence in April of 2011 and presumably had his records because you had assigned medical release. We were not able to get much in the way of records from Dr. Wu. We had a single-page document until the disclosure of his, again, what plaintiff characterized as a report, and that came to us in February 2012, and I would invite the Court to look at that. It's at Supplemental Excerpts of Record 196. It is, again, a single-page, very brief document that in no way comports with the requirements of Rule 26 for an expert disclosure. What is your view on the difference between the testimony of treating physicians as recipient witnesses and as experts? Well, I think the district court addressed that in the hearing and indicated that those doctors would be able to discuss the time that they had with the plaintiff, the treatment of the plaintiff, but would not be able to offer an opinion in regard to causation. However, the problem was that even if we were to designate the doctors listed as treating physicians, the plaintiff still had not complied with the requirement to tell us who those doctors were until it was much too late, and then we only got a very cursory indication of what they might say. In fact, even in February 2006 with the purported expert disclosure, and that's at Supplemental Excerpts of Record 126, we just get a very vague indication of what these doctors might say. It was sort of a guessing game about what injury we were talking about and what might come to light should they be allowed to testify. And then there's an indication after the list of each doctor that documents and a full report would be forthcoming. Those were not forthcoming. What we received were the documents, again, starting at Supplemental Excerpts 136, and they're woefully inadequate. If the Court has no further questions, we would submit on the record. No further questions? Your time has expired unless the Court has any further questions. Thank you for your argument. Cases here will be submitted for a decision.
judges: Thomas, Smith, Christen